# Pennsylvania Coal Company *versus* Sanderson and Wife.

1. A coal mining company pumped from its mines water which found its way into and polluted a previously pure stream. In an action against the company for damages, by a riparian owner on the stream, *Held*, that the fact that coal mining is an important industry would not relieve the defendant from liability, and that it could not justify its action on the ground that the customary mode of disposing of water pumped from mines in the coal regions was to allow it to flow into the adjacent natural watercourses, as such usage lacked the necessary age to establish a general custom, and such a custom would not only be unreasonable, but unlawful.

2. Sanderson *v.* Pennsylvania Coal Co., 5 Norris 401, followed.

April 2d 1880. Before SHARSWOOD, C. J., MERCUR, GORDON, PAXSON, TRUNKEY and STERRETT, JJ. GREEN, J., absent.

Error to the Court of Common Pleas of *Lackawanna county:* Of January Term 1880, No. 63.

Trespass on the case by J. Gardner Sanderson and wife, in right of said wife, against the Pennsylvania Coal Company, to

recover damages for the alleged corruption of a stream of water used by plaintiffs, by reason of the working of the colliery of defendant.

In 1868 the plaintiffs purchased a tract of land, within the limits of the city of Scranton, on which they erected a handsome residence and other improvements, at a cost of about $80,000. A stream of water called "Meadow Brook" flows through this tract, and before its purchase Mr. Sanderson traced it to its source, and it was, it appeared, one of the principal inducements to the purchase made by him. The stream was about an average width from its source to the house of plaintiffs. The water, when the stream was examined by Mr. Sanderson, was perfectly pure. Dams were built across the stream by Mr. Sanderson for the purpose of fish and ice ponds, and to supply a cistern, and the water was carried in pipes from the cistern to a ram, and thence forced to a tank in the attic of the house. After these improvements were made the defendant opened a coal mine on the side of a hill about three miles above the house of the plaintiffs. A drift was first made into this mine and a shaft afterwards sunk. The water which collected in this drift, as well as that pumped by engines from the shaft, ran into the creek. It was alleged that the effect of the water from the mine was to corrupt the water of the stream so as to unfit it for domestic use. There was evidence that the fish in the brook were destroyed; that the willows along the bank died; that the pipes connecting the stream with the cistern, the ram and the house, were corroded and eaten out; that the water was unfit for household use in 1873, and that in 1875 its use for all purposes was abandoned. No change was made in the appearance of the water, but it was conceded that it was acid and unfit for use.

At a former trial in Luzerne county, the court granted a compulsory nonsuit, which judgment this court reversed (see 5 Norris 401), and a new venire having been awarded, the suit was transferred to Lackawanna county on the erection of said county.

At the trial, before Handley, P. J., the defendant offered to show by the witness on the stand and other witnesses, that it was mining coal from its mines upon this stream, and making such disposition of the mine water from its mines as, according to custom and common consent, has been the mode ever since coal mining was begun, and in the mode that the memory of man runneth not to the contrary. It proposed to show a custom for the whole anthracite coal region in Lackawanna and Wyoming.

Objected to, and objection sustained. (2d assignment of error.)

The first point of the plaintiffs, with the answer of the court thereto, were as follows:—

"If the jury find from the evidence that the operations of the defendant, by polluting the waters of the Meadow Brook, caused an injury to the plaintiffs prior to the bringing of their

action, then they are entitled to recover as damages such an amount as will compensate such injury."

Ans. "If you find from the evidence that the defendant did pollute and corrupt the waters of the Meadow Brook stream, then we affirm this point."

The first point of the defendant, with the answer of the court thereto were as follows:

1. If the jury believe from the evidence that it was impossible for the defendant to mine its coal on its lands along this stream without discharging the mine water from its mines, and that the mining was done without malice or negligence; and. that no foreign substance was introduced into the mine water by the defendant; and that when the mine water was so discharged it followed the law of gravity, as directed by the natural conformation of the land, and flowed by a natural flow into this stream, and thence through the plaintiffs' property; then, even if thereby the plaintiffs were damaged, it is *damnum absque injuria*, and plaintiffs cannot recover.

Ans. "The Latin language in this point simply means a loss without an injury. If you find from the evidence that it was possible for the defendant to mine its coal on its lands along this stream without polluting the water thereof, then we cannot affirm this point."

Verdict for plaintiffs for $250, and after judgment thereon the defendant took this writ, and alleged, inter alia, that the court erred in rejecting the above testimony and in the answers to the foregoing points.

*A. T. McClintock, I. J. Post* and *Samuel Dickson*, for plaintiff in error.—The defendant below set up in its pleadings a special custom in the anthracite region, recognising, without cavil or objection within memory of man, the same mode and manner of mining and of disposing of mine water as were used by defendant. They claimed that operating their mines in accordance with the custom, such custom proved was a full answer and defence to the action.

The evidence, we submit, should have been received for the purpose for which it was offered: Carylon *v.* Lovering et al., 40 Eng. L. & Eq. 448; Rogers *v.* Brenton, 59 Eng. Com. L. 26; Hartzall *v.* Sill, 2 Jones 248; McMasters *v.* Railroad Co., 19 P. F. Smith 374; Carter *v.* Coal Co., 27 Id. 286. The right of the riparian owner is not an absolute right. It is incident merely to his ownership of land through which the stream has its course. All such rights are liable to be modified and abridged in the enjoyment by the exercise by others of their own rights, and so far as they are thus abridged the loss is *damnum absque injuria*. The only limit that can be set to this abridgment through the exercise

by others of this natural right, is in the standard or measure of reasonable use : Merrifield *v.* Worcester, 110 Mass. 216.

Usage is some proof of what is considered a reasonable and proper use of that which is a common right, because it affords evidence of the tacit consent of all parties interested to the general convenience of such use : Gould *v.* Boston Duck Co., 13 Gray 452 ; Haskins *v.* Haskins, 9 Id. 390.   What is a reasonable use, under all the circumstances, must depend on the character of the stream, its relative position, the usage of the country and the state of the arts ; Tourtellot et al. *v.* Phelps, 4 Gray 376.

The flow of mine water into a surface stream cannot of itself be regarded as a nuisance in the mining regions of this state.

This proposition rests upon well-settled distinctions in the law of nuisance.   The common law is a practical system intended to govern everyday life, and it is necessary that many kinds of business should be carried on, though productive of disagreeable results.   All that the law can do is not to prohibit them altogether, but to confine them to the proper localities : Galbraith *v.* Oliver, 3 Pitts. 78 ; Richard's Appeal, 7 P. F. Smith 105 ; Rhodes *v.* Dunbar, Id. 287 ; Tipping *v.* Smelting Co., 116 E. C. L. R. 608 ; Huckenstine's Appeal, 20 P. F. Smith 106 ; Attorney-General *v.* Cleaver, 18 Vesey, Jr. 219, 220 ; Wier's Appeal, 24 P. F. Smith 241.   There is not a stream that flows within the outcrop of the coal that is not more or less impregnated with sulphuric acid.   If this plaintiff can recover, the dwellers upon the banks of the Schuylkill, Lehigh and Susquehanna can maintain their action, and the mining of anthracite coal can be entirely stopped.

The right of a riparian owner in a surface stream must be determined by its location and the custom of the country.   It would be in the highest degree unreasonable to blindly follow the decisions of the English courts on questions relating to the use of water in this country.   There must always be allowed a reasonable use, and the question of extent must depend upon the circumstances of the case.   Numerous illustrations will be found in Washburne on Easements, pages 231, 233, 259, 270, 329 and 336.

In a country developing so rapidly as this, it will not do to apply the rules, which have grown up in England, in respect to the acquisition of prescriptive rights in surface streams.   The common law of Pennsylvania differs in many respects from that of England, and with each new development the law must recognise the new relations thereby created : Snow *v.* Parsons, 28 Vt. 459 ; Jacobs *v.* Allard, 42 Id. 303 ; Atchison *v.* Peterson, 20 Wall. 507 ; Jennison *v.* Kirk, 8 Otto 457.   As there is no liability for the total destruction of wells or springs or surface streams by mining operations, nor for the flow of mine water into adjacent mines, one who conducts his mining operations with due care and skill is not respon-

13 Norris—20

sible for the flow of mine water from his mine, although it may lead to a partial destruction of the value of a surface stream.

Liability cannot be attached to the bare exercise of a legal right if the party injuring confines himself strictly to its exercise, and if the hurt done could not have been avoided except by abandoning the right. *Qui jure suo utitur nemini injuriam facit*, or *neminem lædit:* Wharton on Negligence, sect. 781. It was upon this principle that the case of Acton *v.* Blundell was decided. It has been repeatedly followed in this country, and the reasoning upon which the decisions are based is equally available for the plaintiff in error in this action : Wheatley *v.* Baugh, 1 Casey 528 ; Haldeman *v.* Bruckhart, 9 Wright 514 ; Frazier *v.* Brown, 12 Ohio 311 ; Chasemore *v.* Richards, 7 H. L. C. 349. This last is a leading case. See, also, Crompton *v.* Lea, L. R., 19 Eq. 115 ; Wilson *v.* Waddell, 2 Appeals Cas. 95.

The law surely must and will be adjusted to the great industrial interests of the state. The right to mine coal is not a nuisance ; the exercise of that right is lawful ; and if, in the exercise of such lawful right, in the way in which the right has been exercised since coal mining began in the state, streams of water, the natural courses for drainage, are affected by bringing to the surface the water that percolates into the mines, the riparian owner must submit to the incident. If he cannot claim damage for the spring or the well that is totally destroyed by mining adjoining land, surely he is equally without redress for the effect of mine water flowing into such stream and allowed to flow in the natural drain channel in the natural state in which it comes from the mines.

*A Ricketts*, for defendants in error.—In Broom's Maxims, p. 882, it is stated that the requisites of a custom are that it must be certain, reasonable, ancient, continual, peaceably enjoyed, and acquiesced in, compulsory, consistent, and if in derogation of the common law or of general right strictly construed. There never was a colliery on this stream previous to that of plaintiffs' in error, and they had present in court witnesses whose memory ran back of the opening of the first colliery in the whole region. But the following cases doubtless settle the question against the plaintiffs upon general principles : Bolton *v.* Colder and Wilson, 1 Watts 360 ; Rapp *v.* Palmer, 3 Id. 178 ; Stoever *v.* Lessee of Whitman, 6 Binn. 416 ; Coxe *v.* Heisley, 7 Harris 243 ; Wetherill *v.* Neilson, 8 Id. 448 ; Christian *v.* Dripps, 4 Casey 271 ; Blewett *v.* Tregonning, 3 Ad. and El. 554 (30 E. C., L. R. 151) ; Bryant *v.* Com. Insurance Co., 6 Pick. 131 : Strong *v.* Bliss, 6 Metc. 393. And the following cases settle it, particularly : Jones *v.* Wagner, 16 P. F. Smith 429 ; Horner *v.* Watson, 29 Id. 242.

Mr. Justice GORDON delivered the opinion of the court, May 3d 1880.

[Pennsylvania Coal Co. v. Sanderson.]

The material points in this case have been most fully and carefully discussed in the opinion delivered by our late lamented brother WOODWARD, in this same case when here before, and which may be found in 5 Norris 401. As that opinion has been faithfully followed in the court below, we are relieved of any extended examination of the case as now presented. Whether or not the injury complained of resulted from the act of the defendant in pumping deleterious mine water into the Meadow Brook, was fairly submitted to the jury, and that body found that that was the immediate cause of the injury. When, in 1868, Mrs. Sanderson purchased her property on Meadow Brook, she found the water of this stream pure and valuable for domestic purposes. Her right to have and use these waters, as she found them, is undoubted. This right, though of an incorporeal character, was as absolute as her right to the land through which they flowed. But that right has been destroyed, or its value seriously impaired by the direct act of the defendant. As then, it has been the cause of the injury, why should it not be held to an account therefor ? The answer is twofold: 1st. It is said, the pollution of this brook results from the necessities of coal mining, and as that is an industry important to the welfare of this Commonwealth, the right of the plaintiff must yield to it. But this argument is fallacious in this: the mining operations of the defendant do not involve the public welfare, but are conducted purely for the purposes of private gain. Incidentally, all lawful industries result in the general good; they are, however, not the less instituted and conducted for private gain, and are used and enjoyed as private rights over which the public has no control. It follows, that none of them, however important, can justly claim the right to take and use the property of the citizen without compensation.

2d. It is urged, that the customary mode of disposing of water pumped from mines, in the Lackawanna and Wyoming coal regions, has been to allow it to flow into the adjacent natural watercourses. Of this proof was offered, and that for the purpose of showing a general custom thus to use the rivers, creeks and smaller streams of this part of the state, and, it may be added, so to destroy the rights of riparian owners. As a local custom, or prescription, this has no application to the case in hand, for the colliery of the defendants appears to be the only one within the territory drained by Meadow Brook, and the pollution of its waters has occurred since the plaintiff's purchase. As a general custom it lacks the necessary age, for the beginning of deep coal mining, in the regions above named, is quite within the memory of men yet living. Wanting this, it fails in a particular essential to the establishment of such a custom : Jones v. Wagner, 16 P. F. Smith 429. But more fatal still, to the defendants' pretension, is the fact that the effort is thus to justify the disturbance of private

[Pennsylvania Coal Co. *v.* Sanderson.]

property for the advancement of the private interests of the defendant corporation, and that, not under the plea of an ancient customary use, arising before the plaintiffs' acquired title, but of a general custom which would authorize the present injury or distruction of the rights of riparian owners.    But a custom, such as this, would not only be unreasonable but also unlawful, and therefore worthless.    It is urged that mining cannot be carried on without this out-flow of acidulous water, hence, of necessity, the neighboring streams must be polluted.    This is true; and it is also true that coal mining would come to nothing without roads upon which to transport the coal after it is mined; therefore, roads are necessary; but it does not follow that, for such purpose, the land of an adjacent owner may be taken, or his right of way encumbered, without compensation.

If, indeed, the custom set up were to prevail, then, at least so far as coal mining companies are concerned, there would be an abrogation of the 8th section, art. 14 of the Constitution, which provides that "municipal and other corporations invested with the privilege of taking private property for public use, shall make just compensation for property taken, injured or destroyed by the construction and enlargement of their works, highways or improvements."    Not only would we thus have a custom superior to the supreme law of the land, but one reaching even beyond the possible sovereignty of the state, in that, it would empower private persons, for private purposes, to injure or destroy private property, and that without compensation.    A custom, such as this, is radically bad, and cannot be sustained.

Judgment affirmed.

PAXSON and STERRETT, JJ., dissented.